UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**AARP**,

    Plaintiff,

  v.

**MICHAEL SYCLE,**

    Defendant.

Civil Action No. 13-0608 (CKK)

**MEMORANDUM OPINION**
(January 17, 2014)

Plaintiff AARP ("AARP") filed suit against Defendant Michael Sycle ("Sycle") on April 30, 2013 alleging trademark counterfeiting and infringement under the Lanham Act and District of Columbia law. *See* Compl., Dkt. No. [1]. Although properly and timely served with the Complaint and Summons, Defendant failed to respond to the Complaint, and the Clerk of the Court, upon motion by Plaintiff, entered default against Defendant on July 19, 2013. *See* Clerk's Entry of Default as to Michael Sycle, Dkt. No [8]. Plaintiff subsequently filed a [10] Motion for Default Judgment, which was granted-in-part and held-in-abeyance in part. *See* Order (Nov. 27, 2013), ECF No. [11]. Specifically, the Court granted AARP's Motion for Default Judgment as to Sycle's liability and AARP's requests for injunctive relief and attorneys' fees, but held the motion in abeyance with respect to AARP's request for statutory damages pursuant to 15 U.S.C. § 1117(c). The Court directed AARP to file a supplemental memorandum providing further support for its damages request, as well as documentation in support of its request for attorneys' fees and costs.

Presently before the Court is Plaintiff's [13] Supplemental Memorandum in Support of its

Motion for Default Judgment. Having thoroughly considered Plaintiff's submissions[1], including the attachments thereto, applicable case law, statutory authority, and the record of the case as a whole, the Court GRANTS those portions of Plaintiff's [10] Motion for Default Judgment held in abeyance by this Court's November 27, 2013 [11] Order. Plaintiff is entitled to a monetary judgment in the amount of $600,940.40 which consists of: (a) $583,200.00 in statutory damages pursuant to 15 U.S.C. § 1117(c); (b) $17,150.40 in reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a); and (c) $590.00 in reasonable costs pursuant to 15 U.S.C. § 1117(a).

## I. BACKGROUND

Plaintiff filed a Complaint in the above-captioned case on April 30, 2013, alleging (1) trademark counterfeiting, trademark infringement, unfair competition, false designation of origin, and false advertising under the Lanham Act, 15 U.S.C. §§ 1114, 1125, and (2) trademark infringement, unfair competition, and false designation of origin under District of Columbia common law. Compl. ¶¶ 24-37. Plaintiff is a non-profit organization with its principal place of business in Washington, D.C. that works to promote the interests of persons age 50 and over. *Id.* ¶¶ 7-8. As is relevant to the instant case, Plaintiff is the owner of all rights in and to several trademarks relating to insurance and insurance-related services (Reg. Nos. 1,046,998; 1,335,496; 2,461,155; 3,236,039; 3,493,206) (hereinafter "AARP Marks"). Pl.'s Mem. at 1; *see also* Compl. ¶ 11. Through its licensees, Plaintiff offers a wide variety of products and services under the AARP mark, including insurance. Compl. ¶ 9. Plaintiff receives royalties from the use of its

---

[1] Compl., ECF No. [1]; Pl.'s Mot. for Default J., ECF No. [10] ("Pl.'s Mot."); Mem. of Law in Supp. of Pl.'s Mot. for Default J., ECF No. [10] ("Pl.'s Mem."); Decl. of Mary D. Hallerman in Supp. of Pl.'s Mot. for Default J., ECF No. [10-1] ("Hallerman Decl."); Pl.'s Suppl. Mem. in Supp. of its Mot. for Default J., ECF No. [13] ("Pl.'s Suppl. Mem."); Decl. of John J. Dabney in Supp. of Suppl. Mem. in Supp. of Mot. for Default J., ECF No. [13-1] ("Dabney Decl."); Decl. of Robert Marks, ECF No. [13-2] ("Marks Decl.").

marks in connection with the sale of insurance.  *Id.* ¶ 10.

Defendant is an insurance broker operating under the name M&G Insurance Group, Inc. *Id.* ¶ 2.  Defendant uses "AARP" to advertise and promote his insurance business without Plaintiff's permission.  *Id.* ¶¶ 3, 13.  Despite the fact that he does not sell AARP-branded insurance, Defendant falsely offers to sell "AARP Life Insurance" on his website, alifetimeinsurance.com.  *Id.* ¶¶ 13-14.  He has also falsely advertised his ability to sell "AARP Life Insurance" through Internet advertisements and YouTube videos directing viewers to his website and toll-free telephone number.  *Id.* ¶¶ 14-16.

Prior to initiating this litigation, Plaintiff demanded that Defendant cease his use of the AARP Marks.  *Id.* ¶ 17.  However, even after being contacted by Plaintiff, Defendant continued to use Plaintiff's AARP Marks to promote his insurance business and create the false impression that his company sells AARP-branded insurance.  *Id.* ¶¶ 17-18.  Consequently, Plaintiff commenced this trademark counterfeiting and infringement action on April 30, 2013.  Defendant was served with the Complaint and Summons on June 14, 2013 and was therefore required to respond by July 5, 2013.  *See* Return of Service/Affidavit, Dkt. No. [5]; *see also* Pl.'s Mot. for Entry of Default, Dkt. No. [6].  Defendant failed to file an answer or otherwise respond to Plaintiff's Complaint, and Plaintiff moved for entry of default as to Defendant.  *See* Pl.'s Mot. for Entry of Default, Dkt. No. [6].  On July 19, 2013, the Clerk of the Court entered default against Defendant.  *See* Clerk's Entry of Default as to Michael Sycle, Dkt. No. [8].  As of the date of Plaintiff's motion, Defendant continued to employ AARP marks on his website and maintain YouTube videos falsely advertising that his company offers AARP-branded insurance.

Plaintiff subsequently filed a [10] Motion for Default Judgment, which was granted-in-part and held-in-abeyance in part.  *See* Order (Nov. 27, 2013), ECF No. [11].  Specifically, the

Court granted AARP's Motion for Default Judgment as to Sycle's liability and AARP's requests for injunctive relief and attorneys' fees, but held the motion in abeyance with respect to AARP's request for statutory damages pursuant to 15 U.S.C. § 1117(c). *Id.* The Court directed AARP to file a supplemental memorandum providing further support for its damages request, as well as documentation in support of its request for attorneys' fees and costs. *Id.* Plaintiff filed its [13] Supplemental Memorandum on December 20, 2013. As of the date of this Supplemental Memorandum, in spite of this Court's injunction barring his improper use of Plaintiff's marks, Defendant continued to employ AARP marks on his website and maintain YouTube videos falsely advertising that his company offers AARP-branded insurance. Pl.'s Suppl. Mem. at 11; Dabney Decl. ¶ 20. Indeed, Defendant continues to use AARP marks on his website even as of the date of this Opinion. *See* M&G Insurance Group, http://alifetimeinsurance.com (last visited Jan. 17, 2014).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 55(a) provides that the Clerk of the Court must enter a party's request for a default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise." Fed. R. Civ. P. 55(a). After a default has been entered by the Clerk, a party may move the court for a default judgment. Fed. R. Civ. P. 55(b)(2). "The determination of whether default judgment is appropriate is committed to the discretion of the trial court." *Int'l Painters & Allied Trades Indus. Pension Fund v. Auxier Drywall, LLC*, 531 F. Supp. 2d 56, 57 (D.D.C. 2008) (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)).

Upon entry of default by the clerk of the court, the "defaulting defendant is deemed to admit every well-pleaded allegation in the complaint." *Int'l Painters & Allied Trades Indus.*

4

*Pension Fund v. R.W. Amrine Drywall Co., Inc.*, 239 F.Supp.2d 26, 30 (D.D.C. 2002) (internal citation omitted). "Although the default establishes a defendant's liability, the court is required to make an independent determination of the sum to be awarded unless the amount of damages is certain." *Id.* (citing *Adkins v. Teseo*, 180 F.Supp.2d 15, 17 (D.D.C. 2001)). Accordingly, when moving for a default judgment, the plaintiff must prove its entitlement to the amount of monetary damages requested. *Id.* "In ruling on such a motion, the court may rely on detailed affidavits or documentary evidence to determine the appropriate sum for the default judgment." *Id.*

### III. DISCUSSION

#### A. Statutory Damages

As set forth in Plaintiff's Motion for Default Judgment, Plaintiff has requested recovery of statutory damages under the Lanham Act. Pl.'s Mem. 18-21. The Lanham Act provides for statutory damages of not less than $1,000 or more than $200,000 per counterfeit mark per type of goods, with an increased limit of $2,000,000 for willful infringement. 15 U.S.C. § 1117(c). "Courts have substantial discretion in awarding statutory damages." *Lifted Research Group, Inc. v. Behdad, Inc.*, No. 08-390, 2010 WL 2662277, at *4 (D.D.C. 2010) (citing *Microsoft Corp v. Compusource Distribs, Inc.*, 115 F.Supp.2d 800, 811 (E.D. Mich. 2000)). Indeed "the statute does not provide guidelines for courts to use in determining an appropriate award," *Louis Vuitton Malletier & Oakley, Inc. v. Veit*, 211 F.Supp.2d 567, 583 (E.D. Pa. 2002), but rather leaves it to each court's discretion to award an amount it "considers just," 15 U.S.C. § 1117(c)(2).

In its Motion for Default Judgment, Plaintiff initially requested that the Court award it $2,000,000 in statutory damages for violations of the Lanham Act. Pl.'s Mem. at 18-21. In light of the limited evidence presented by Plaintiff in its Motion for Default Judgment in support of its claim for the maximum amount of statutory damages, the Court held Plaintiff's request for

statutory damages in abeyance. *See* Order (Nov. 27, 2013), ECF No. [11]. The Court ordered that if Plaintiff continued to seek statutory damages pursuant to 15 U.S.C. § 1117(c), it should submit further briefing setting out, if necessary, a revised estimate for these damages that more reasonably reflects all available information. *Id.* Relying on other courts' assessments of the magnitude of statutory damages appropriate under 15 U.S.C. § 1117(c), the Court ordered Plaintiff to focus its supplemental brief on information relevant to the following seven factors: (1) expenses saved and profits reaped; (2) the revenue lost by the plaintiffs; (3) the value of the copyright or trademark; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether the defendant cooperated in providing particular records from which to assess the value of the infringing material product; and (7) the potential for discouraging the defendant. *Tiffany (NJ) Inc. v. Luban*, 282 F.Supp.2d 123, 125 (S.D.N.Y. 2003) (citing *Fitzgerald Publishing Co., Inc. v. Baylor Publishing Co.*, 807 F.2d 1110, 1117 (2d Cir. 1986)). Plaintiff subsequently submitted its supplemental memorandum, which provides information in support of these seven factors. Pl.'s Suppl. Mem. 3-13. This supplemental memorandum also contains a revised request for statutory damages of $583,200, rather than the $2,000,000 initially sought. *Id.* at 3.

Plaintiff devotes most of its attention to the first factor – the expenses saved and profits reaped by the Defendant. *Id.* at 4-8. In its supplemental memorandum, Plaintiff has provided estimates of the amount earned by Defendant due to his infringement. In computing this estimate, Plaintiff relies primarily on Defendant's statement on his MySpace page in January 2013 that he is the owner of the website "alifetimeinsurance.com for 20 months which was generating 300 leads a month before penguin." Dabney Decl. ¶ 13 & Exhibit J (Screenshot of Defendant's MySpace Page). First launched in April 2012, "penguin" is an algorithm used by

Google to decrease the search engine ranking of websites suspected of artificially boosting their rankings. *See generally* Sarah E. Needleman & Emily Maltby, *As Google Tweaks Searches, Some Get Lost in the Web*, WALL ST. J., May 16, 2012. Multiplying 20 months by 300 leads per month, the figures on Defendant's MySpace page, Plaintiff states that it is reasonable to infer that Defendant generated a total of 6,000 leads during this period from the use of AARP marks. Pl.'s Suppl. Mem. at 6. Plaintiff further notes that this is an extremely conservative estimate of the total leads generated by Defendant, as it ignores any leads generated by Defendant after April 2012. *Id.* The Court takes note of the fact that a video posted by Defendant to YouTube in July 2012 advertising AARP Life Insurance at Defendant's website has been viewed 77,000 times. Pl.'s *Id.* at 4; Dabney Decl. ¶ 4 and Exhibit A (Screenshot of Defendant's YouTube Video). Accordingly, the Court accepts as reasonable Plaintiff's estimate that Defendant generated at least 6,000 leads based on his fraudulent use of Plaintiff's marks.

In order to assess the amount of revenue generated from these leads, Plaintiff has submitted a declaration from Robert Marks, an employee of New York Life, Plaintiff's exclusive licensee for providing AARP-branded life insurance. Marks Decl. ¶¶ 1-3. Marks states that based on his experience, the conversion rate for individuals who contact New York Life inquiring about AARP Life Insurance is 10.8%, meaning that 10.8% of those individuals who contact New York Life purchase AARP Life Insurance with the company. *Id.* ¶ 8. Marks further states that the average premium on New York Life's AARP-branded life insurance is approximately $600 per year and that the average AARP-branded life insurance policy remains in effect for seven years. *Id.* ¶¶ 5-6. Marks also describes the typical commission structure for the life insurance industry, under which sales agents are paid a declining percentage of the premium over the life of the policy. *Id.* ¶ 7. This commission ranges from 47% to 52% of the

7

premiums received by the insurance company in the first year of the policy, and falls to approximately 2% to 3% of the premiums paid to the insurance company in the final year of the policy. *Id.*

Based on these figures, Plaintiff estimates that Defendant sold life insurance policies to 648 individuals. Pl.'s Suppl. Mem. at 7. This represents the 6000 leads estimate multiplied by the 10.8% conversion rate identified by Marks. *Id.* Given the $600 average premium for an AARP life insurance policy, these 648 policies would have generated a total of $388,800 in annual premiums paid by policy holders to insurance companies. *Id.* These premiums would be paid over a seven year period, the average time period of an AARP-branded life insurance policy. *Id.* Using the declining commission structure identified by Marks based on his experience in the life insurance industry, Plaintiff estimates that, from these payments, Defendant would have received a total commission of $291,600 from his fraudulent use of Plaintiff's marks.[2] *Id.* at 7-8.

Relying on the remaining factors, Plaintiff next argues that this $291,000 should be doubled such that Plaintiff receives a total statutory award under 15 U.S.C. § 1117(c) of $583,200. *Id.* at 8-14. In support of this request for increased damages, Plaintiff presents the following information, which it contends, taken as a whole, supports the doubling of the

---

[2] Plaintiff estimates that Defendant would have received the following commissions each year based on the average length of an AARP policy and the declining commission rate. These yearly commissions total $291,600, the amount Plaintiff estimates Defendant has earned from his infringement.
> Year 1: $388,800 * 47% = $182,736
> Year 2: $388,800 * 10% = $38,880
> Year 3: $388,800 * 5% = $19,440
> Year 4: $388,800 * 5% = $19,440
> Year 5: $388,800 * 3% = $11,664
> Year 6: $388,800 * 3% = $11,664
> Year 7: $388,800 * 2% = $7,776

statutory award.

First, Plaintiff points to the amount of revenue lost by its licensees. *Id.* at 8. Defendant advertises on his website that he provides life insurance policies from companies that compete with AARP's exclusive licensee, New York Life Insurance Company. Dabney Decl. ¶ 5 & Exhibit B (Screenshots of www.alifetimesinsurance.com). Plaintiff argues that Defendant's sale of insurance under its marks thus deprives its exclusive licensee of revenue. Pl.'s Suppl. Mem. at 8. Relatedly, Plaintiff states that its marks are famous and valuable. *Id.* at 8-9. According to AARP's Consolidated Financial Statements, AARP earned $723,840,000 in total royalties from licensing its marks in 2012. Dabney Decl. ¶ 18 & Exhibit N (AARP Consolidated Financial Statements); Errata Sheet Correcting Error in Dkt. Nos. 13 & 13-1, ECF No. [14]. Presumably if AARP licensees are deprived of revenue due to infringement of AARP marks, AARP will be deprived of some of these royalties.

Next, Plaintiff argues that an increased statutory award is necessary to deter Defendant and other potential infringers. Pl.'s Suppl. Mem. at 9-10, 12-13. "[S]tatutory damages under the Lanham Act serve to compensate trademark holders for their losses and *deter* wrongful conduct." *Lifted Research Group, Inc.*, 2010 WL 2662277, at *4 (emphasis added). To be sure "[t]he Court is mindful of the need to send a signal to th[is] defendant[], *as well as others*, that they will pay a substantial price for willfully infringing the intellectual property rights of others." *Telebrands Corp. v. HM Import USA Corp.*, No. 09-cv-3942, 2012 WL 3930405, at *9 (E.D.N.Y. July 26, 2012) (emphasis added). This is particularly true here, where Defendant has used Plaintiff's marks to engage in deceptive advertising practices directed at a vulnerable population – older Americans. *See Medline Indus., Inc. v. 9121-3140 Quebec, Inc.*, No. 09-cv-301, 2010 WL 840196, at *7 (D.N.H. Mar. 5, 2010) (enhancing award of damages pursuant to 17

9

U.S.C. § 1117(a) where defendant "deliberately used [plaintiff's] trademark to deceive elderly consumers into buying fraudulent pharmaceutical discount coupons."). Plaintiff argues that the AARP mark is widely recognized as a symbol of trustworthiness by senior citizens and Defendant's actions threaten to undermine that trust. Pl.'s Suppl. Mem. at 9. In addition, an increased award to account for deterrence is appropriate here because Defendant has continued to use Plaintiff's marks despite this Court's Order enjoining such conduct. *Id.* at 12-13.

Relatedly, Plaintiff points to the willfulness of Defendant's actions. *Id.* at 10-11. In its previous opinion in this case, the Court held that Defendant willfully infringed Plaintiff's mark, justifying an award pursuant to 15 U.S.C. § 1117(c) in excess of $100,000. *See* Memorandum Opinion (Nov. 27, 2013), ECF No. [12] at 9. The following facts established Defendant's willfulness: (1) Defendant's continued use of Plaintiff's AARP marks to sell insurance despite repeated warning that Plaintiff owned federal trademark registrations for these marks and that his conduct was unlawful; and (2) Defendant's failure to answer or otherwise respond to the Complaint. *Id.* Defendant's willfulness has been further established by his actions since this Court's November 27, 2013 Order, as following this decision, Defendant has continued his use of Plaintiff's marks, despite an injunction prohibiting such action. Dabney Decl. ¶ 20.

In addition, Defendant has failed to cooperate in providing records from which to assess the revenues generated from his infringement. Pl.'s Suppl. Mem. at 12. Since Defendant has refused to participate in this litigation and has not provided any information to Plaintiff or the Court regarding his sales, revenues, profits, or expenses, Plaintiff lacks the ability to make detailed estimates of Defendant's gains. *Id.*

In light of the evidence provided by Plaintiff, as well as this Court's "substantial discretion" in awarding statutory damages under the Lanham Act, *Lifted Research Group, Inc.*,

2010 WL 2662277, at *4, this Court awards Plaintiff $583,200 in damages pursuant to 15 U.S.C. § 1117(c). The Court accepts Plaintiff's estimate of the revenue generated by Defendant due to his use of Plaintiff's marks. Further, a doubling of this award is appropriate to account for the loss of revenue to Plaintiff's licenses, the value of Plaintiff's marks, the need to deter Defendant's continued infringement, the need to deter other potential infringers of Plaintiff's marks, the fact that Defendant has used Plaintiff's marks to deceive a particularly vulnerable population, the willfulness of Defendant's conduct, and Defendant's failure to cooperate in assessing the appropriate level of damages.

### B. Attorneys' Fees

In its previous Order in this case, the Court awarded Plaintiff reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1117(a) due to Defendant's willful conduct. Memorandum Opinion (Nov. 27, 2013), ECF No. [12] at 13. *See also ALPO Petfoods, Inc. v. Ralston Purina Co.*, 913 F.2d 958, 961 (D.C. Cir. 1990) ("Attorneys' fees . . . are available under section 35(a) only 'in exceptional cases,' which this court has defined as cases involving willful or bad-faith conduct."). The Court ordered Plaintiff to submit the appropriate documentation of these fees and costs for the Court's review in its Supplemental Memorandum. Memorandum Opinion (Nov. 27, 2013), ECF No. [12] at 13.

Plaintiff now requests $17,740.40 in attorneys' fees and costs incurred in prosecuting this action. Pl.'s Suppl. Mem. at 13-14. Plaintiff has attached supporting documentation showing that it has incurred $28,584.50 in attorneys' fees. Dabney Decl. ¶ 28. However, Plaintiff is only requesting $17,150.40 in attorneys' fees, which represents an approximately 40% discount of the attorneys' fees incurred and does not include the fees associated in preparing Plaintiff's supplemental memorandum. *Id.* ¶ 29. Plaintiff's counsel spent 59.5 hours of attorney time on

this matter, at a rate of $560 to $630 per hour for the partner working on this matter, and a rate of $414 to $460 per hour for the associate assisting on the case, respectively. *Id.* ¶¶ 26-27 & Exhibit O (Plaintiff's Attorneys' Time Entries). The $17,150.40 total provided to the Court represents a 40% discount of these fees. *Id.* ¶ 29. Plaintiff is also requesting $590.00 in costs incurred in litigating this action, which are based on expenses for the filing fee and service of process on Defendant. *Id.* ¶ 30. Plaintiff has provided documentation showing that these rates are reasonable for the services rendered. *Id.* ¶¶ 31-32. Accordingly, the Court shall award the attorneys' fees and costs requested. Thus, the total money judgment for Plaintiff shall be $600,940.40.

## IV. CONCLUSION

For the foregoing reasons, the Court shall GRANT those portions of Plaintiff's [10] Motion for Default Judgment held in abeyance by this Court's November 27, 2013 [11] Order. Specifically, the Court awards AARP a monetary judgment in the amount of $600,940.40. This monetary award consists of: (a) $583,200.00 in statutory damages pursuant to 15 U.S.C. § 1117(c); (b) $17,150.40 in reasonable attorneys' fees pursuant to 15 U.S.C. § 1117(a); and (c) $590.00 in reasonable costs pursuant to 15 U.S.C. § 1117(a). In light of the complete resolution of Plaintiff's [10] Motion for Default Judgment, this action is dismissed in its entirety. An appropriate Order accompanies this Memorandum Opinion.

                                                 */s/*
                                         **COLLEEN KOLLAR-KOTELLY**
                                         UNITED STATES DISTRICT JUDGE